**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| HUNTINGTON BANCSHARES INCORPORATED AND THE HUNTINGTON NATIONAL BANK, | ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| CONTINENTAL CASUALTY COMPANY, | ) |
| | ) |
| | ) |
| Defendant. | ) |

Case No.:_____

Judge: _____

**COMPLAINT**

**JURY DEMAND REQUESTED**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Huntington Bancshares Incorporated ("HBI") and The Huntington National Bank ("HNB") (collectively, "Plaintiffs" or "Huntington"), for their Complaint against Continental Casualty Company ("Defendant" or "CNA") state and allege as follows:

**INTRODUCTION**

1.      This is an action for (1) declaratory judgment, and (2) breach of contract, arising out of CNA's failure to fulfill its coverage obligations to Huntington under a property and business interruption insurance policy.  As described more fully below, CNA has refused to provide Huntington coverage for losses and damages associated with the Novel Coronavirus and its resulting disease, COVID-19 (collectively, "COVID-19").

2.      CNA agreed to provide Huntington coverage for risks of physical loss of or damage to covered property from any cause (unless specifically excluded) and Huntington's resulting business interruption loss.  This broad coverage covers losses resulting from and associated with COVID-19, as the policy does not include any exclusions that would bar

coverage.  Notably, unlike many other policies, the policy CNA issued to Huntington does not include a "virus" exclusion.  And while the CNA policy does include a "microbe" exclusion, that exclusion notably does not include the term "virus" – unlike other policies issued by CNA that define "microbe" to include "virus."

3.     Despite this broad coverage, CNA has refused to stand by the insurance policy that it wrote and sold to Huntington.  CNA has denied Huntington's insurance claim even though Huntington has suffered physical loss of and/or damage to covered property as a result of COVID-19 and has suffered corresponding losses.  At least some of Huntington's locations were affected by, among other things, and without limitation, the actual presence of COVID-19 at these locations, and/or the ubiquity of COVID-19 and its associated impacts in the communities in which Huntington operates, and governmental orders restricting the use of Huntington's locations.  The ubiquity, or omnipresence, of COVID-19 is largely why it qualifies as a pandemic (the "Pandemic").

4.     CNA initially engaged with Huntington regarding the claim under the auspices that it was investigating whether coverage was available.  At CNA's request, Huntington provided significant information related to its losses, which required substantial effort and expense by Huntington.  CNA, however, subsequently denied its coverage obligations.  Moreover, despite Huntington's request, CNA refused to extend the contractual deadline for bringing this action.

5.     Huntington thus now brings this action to enforce its rights to coverage.  Huntington is entitled to damages up to the applicable limits of coverage, as well as pre-judgment and post-judgment interest, and attorneys' fees to the extent permitted by law.

## THE PARTIES

6.      Plaintiff HBI is a bank holding company and is incorporated under the laws of the State of Maryland with its principal place of business located in Columbus, Ohio.

7.      Plaintiff HNB is a federally chartered national bank with its principal place of business located in Columbus, Ohio.  It is a wholly owned subsidiary of HBI.

8.      Defendant CNA, the principal insurance subsidiary of CNA Financial Corporation, is incorporated under the laws of the State of Illinois with its principal place of business located in Chicago, Illinois.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over defendant CNA because:

    a.      CNA sold and delivered the Policy (defined below) to Huntington at its corporate headquarters in Columbus, Ohio;

    b.      The process leading to the procurement of the Policy largely occurred in Ohio, including CNA selling the Policy through an Ohio-based broker;

    c.      The effects of CNA's denial of coverage will be felt in Ohio as Huntington is an Ohio-based company; and

    d.      CNA has transacted business within the state of Ohio and, upon information and belief, regularly contracts to insure persons, property, and risks located within the state of Ohio.

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Plaintiffs and Defendant and the amount in controversy exceeds $75,000 exclusive of interests and costs.

11.     Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in Columbus, Ohio, including:

   a.     CNA sold and delivered the Policy to Huntington at its corporate headquarters in Columbus, Ohio;

   b.     HBI and HNB are both Ohio-based companies;

   c.     The process leading to the procurement of the Policy largely occurred in Ohio, including CNA selling the Policy through an Ohio-based broker;

   d.     Huntington's assertion of its claim occurred in Ohio; and

   e.     The effects of CNA's denial of coverage will be felt in Ohio as Huntington is an Ohio-based company.

## FACTUAL BACKGROUND

### Huntington's Operations

12.     Founded in 1866, Huntington is a full-service banking provider primarily operating across Ohio, Illinois, Indiana, Kentucky, Michigan, Pennsylvania, and West Virginia, with over 800 full-service branches and 1,300 ATM locations.

13.     Huntington provides full-service commercial, small business, and consumer banking services; mortgage banking services; treasury management and foreign exchange services; equipment leasing; wealth and investment management services; trust services; brokerage services; and customized insurance brokerage and service programs.

14.     For more than 150 years, Huntington has conducted substantial business in Ohio, supported the Ohio economic community, and employed a substantial workforce in Ohio.

15.     Huntington relies on numerous other businesses in its supply chain to operate its branches, ATM locations, and other locations including, among others, the production and shipping companies that supply it with equipment and materials.

### Huntington's Purchase of the CNA Policy

16.     Huntington, like most companies, has been aware of the substantial risk that natural and man-made disruptions can pose to its business and, therefore, it purchased insurance coverage to protect itself against the damages resulting from such events, including losses that may result from customers not being able to access its locations and disruption to its suppliers.

17.     Huntington purchased from CNA an insurance policy to provide coverage for physical loss of or damage to property, and any associated business interruption. *See* Policy No. RMP-6023355963, attached hereto as Exhibit A (the "Policy").[1]  The Policy was issued to Huntington for the period of May 1, 2019 to May 1, 2020, and includes an overall "Policy Limit" of $1,000,000,000.

18.     The Policy provides broad coverage for "risks of direct physical loss of or damage to property and/or interests described herein at covered Locations."  Policy § II.  This broad coverage grant is unlike a "named perils" policy, which provides coverage only for losses and risks that are specifically identified in the policy.  Thus, the Policy provides coverage for a broad array of losses and risks, except and only to the extent that any loss or risk is specifically and clearly excluded.

19.     The Policy provides Huntington two independent triggers of coverage: the Policy insures against "physical loss" of property and, separately, against "damage" to property.

---

[1] The Policy includes various sub-limits, which are set forth in the declarations.  A true and correct copy of the Policy is attached hereto as Exhibit A.

20. As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "damage."

21. The Policy does not define the term "physical."

22. The Policy does not define the term "physical loss."

23. The Policy does not define the term "damage."

24. The Policy does not define the phrase "physical loss or damage."

25. The Policy provides "Time Element" "business interruption" coverage, insuring against loss resulting from interruption of business:

> This policy covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered property, except Finished Stock, by the peril(s) insured against and occurring during the term of this policy at covered Locations occupied by the Insured, subject to the sublimit specified in Section I.4. of this policy.
>
> Policy § II(C)(1).

26. The Policy provides additional coverages, including but not limited to "accounts receivable," "contingent business interruption," "denial of access by civil authority and ingress-egress," "expediting expenses," "extra expense," and "loss adjustment expense," that may also provide coverage to Huntington for this claim.

27. Specifically, the Policy provides coverage for "accounts receivable" coverage, which insures against:

> a. All sums due the Insured from customers, which the Insured is unable to collect solely as the direct result of direct physical loss or damage by peril(s) insured against to the Insured's records of accounts receivable;
> b. Interest charges on any loan to offset impaired collections pending repayment of such sums made uncollectible by such loss or damage;
> c. Collection expense in excess of normal collection cost and made necessary because of such loss or damage;
> d. Other expenses, when reasonably incurred by the Insured in reestablishing records of accounts receivable following such loss or damage.

Policy § II(B)(1).

28.     The Policy provides for "contingent business interruption" coverage, which

insures against "loss to the Insured resulting from necessary interruption of business conducted

by the Insured at Locations occupied by the Insured and covered in this policy, caused by perils

insured against that result in direct physical loss or damage to any real or personal property, of

the type insured hereunder, owned or operated by:"

    a.  direct suppliers or service providers of the Insured, which wholly or
    partially prevents the delivery of materials, products or services (other
    than water, communication or power supply) to the Insured or to others for
    the account of the Insured; or

    b.  direct customers of the Insured, to whom the Insured's products or
    services (other than water, communication or power supply) are provided,
    which wholly or partially prevents the acceptance of said products or
    services by the Insured's customers;

    c.  any other third-parties that the Insured depends upon to attract customers.
    Coverage under this subsection is limited to dependent property within 5
    miles of the Insured's Location, unless it is a Scheduled Dependent
    Property.

Policy § II(C)(4); Endorsement No. 1.

29.     The Policy provides "denial of access by civil authority and ingress-egress"

coverage, which insures against "actual loss sustained:"

    a.  during the period of time while access to the Insured's location is
    prohibited by order of civil authority, but only when such order is given as
    a direct result of physical loss or damage to property of the type insured
    from a peril insured against occurring at or in the immediate vicinity of
    said location; or

    b.  during the period of time when as a direct result of physical loss or
    damage to property of the type insured from a peril insured against,
    ingress to or egress from the Insured's location is thereby physically
    prevented.

Policy § II(C)(10).

30.     The Policy provides "expediting expenses" coverage, which insures against

"reasonable and necessary costs incurred by the Insured to expedite repairs to covered property

following loss or damage covered under this policy. This includes payment of overtime wages and the extra cost to use express or other rapid means of transportation." Policy § II(C)(12).

31.     The Policy provides "extra expense" coverage, which insures against "reasonable and necessary extra expense, as hereinafter defined, incurred by the Insured in order to continue as nearly as practicable the normal operation of the Insured's business following direct physical loss of or damage to covered property by perils(s) insured against." Policy § II(C)(15).

32.     The Policy provides "loss adjustment expense" coverage, which insures against "reasonable expenses incurred by the Insured in preparing claim data when required by the Company," including "the cost of taking inventories, obtaining appraisals and preparing other documentation to show the extent of loss." Policy § II(C)(20).

33.     The Policy does not include any exclusion for losses caused by viruses.

34.     While the Policy does exclude coverage for loss or damage caused by "Contaminants or Pollutants" and by "Microbes," neither exclusion is defined to include viruses such as COVID-19, even though CNA has issued policies in the marketplace specifically including the term virus in the definitions.

### COVID-19 Causes Physical Loss of and/or Damage to Property

35.     COVID-19 is a deadly communicable disease that has already infected over 28 million people in the U.S. and caused more than 524,698 deaths.[2] It has been the most significant and most discussed public health event in over 100 years.

---

[2] JOHNS HOPKINS UNIVERSITY & MEDICINE CORONAVIRUS RESOURCE CENTER,
(https://coronavirus.jhu.edu/map.html) (last visited Mar. 7, 2021).

36.    In that regard, the nature of the virus and its transmissibility have been the subject of extensive analysis both in the general media and numerous scientific journals.  That reporting has focused on:

- the behavior of the virus on surfaces;

- the behavior of the virus in the air;

- the various means of its transmission; and

- how much the virus has spread/how likely it is to be present in the community.

37.    Rather than repeat all the details of this extensive reporting here, Huntington incorporates the reporting by reference, including, without limitation, the materials cited in footnote 3 below.[3]

---

[3] Heath Kelly, *The classical definition of a pandemic is not elusive*, 89 BULLETIN OF THE WHO 7, at 540-41 (2011) (https://www.who.int/bulletin/volumes/89/7/11-088815/en/#:~:text=A%20pandemic%20is%20defined%20as) (last visited Feb. 4, 2021); Erika Edwards, *CDC says COVID-19 cases in U.S. may be 10 times higher than reported*, NBC NEWS (June 25, 2020) (https://www.nbcnews.com/health/health-news/cdc-says-covid-19-cases-u-s-may-be-10-n1232134) (last visited Feb. 4, 2021); HARTFORD HEALTHCARE, *30 Percent of People With COVID-19 Show No Symptoms: Here's Where They Carry It* (Nov. 23, 2020) (https://hartfordhealthcare.org/about-us/news-press/news-detail?articleid=29806&publicId=395) (last visited Feb. 4, 2021); WHO, *Coronavirus disease 2019 (COVID-19) Situation Report* (Apr. 2, 2020) (https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2) (last visited Feb. 4, 2021); Xi He, *et al.*, *Temporal dynamics in viral shedding and transmissibility of COVID-19*, 26 NATURE MED. 672, 674 (Apr. 15, 2020) (https://www.nature.com/articles/s41591-020-0869-5) (last visited Feb. 4, 2021); Lirong Zou, M.Sc., *et al.*, *SARS-CoV-2 Viral Load in Upper Respiratory Specimens of Infected Patients*, N. ENG. J. MED. (Mar. 19, 2020) (https://www.nejm.org/doi/full/10.1056/nejmc2001737) (last visited Feb. 4, 2021); Roman Wolfel, *et al.*, *Virological assessment of hospitalized patients with COVID-2019*, 581 NATURE 465 (Apr. 1, 2020) (https://www.nature.com/articles/s41586-020-2196-x) (last visited Feb. 4, 2021); Neeltje van Doremalen, *et al.*, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. ENG. J. MED. (Apr. 16, 2020) (https://www.nejm.org/doi/full/10.1056/NEJMc2004973) (last visited Feb. 4, 2021); CDC, *How COVID-19 Spreads* (last updated Oct. 28, 2020) (https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html) (last accessed Feb. 4, 2021); CDC, *Scientific Brief: SARS-CoV-2 and Potential Airborne Transmission* (last updated Oct. 5, 2020), (https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-sars-cov-2.html) (last visited Feb. 4, 2021); Ramon Padilla & Javiar Zarracina, *WHO agrees with more than 200 medical experts that COVID-19 may spread via the air*, USA TODAY (last updated Sep. 21, 2020) (www.usatoday.com/in-depth/news/2020/04/03/coronavirusprotection-how-masks-might-stop-spread-throughcoughs/5086553002/) (last visited Feb. 4, 2021); Yuliya Pashina-Kottas, *et al.*, *This 3-D Simulation Shows Why Social Distancing Is So Important*, THE NEW YORK TIMES (Apr. 21, 2020) (https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-arul.html) (last visited Feb. 4, 2021); Sarah Gibbens, *See how a sneeze can launch germs much farther than 6 feet*, NATIONAL GEOGRAPHIC (Apr. 17, 2020) (www.nationalgeographic.com/science/2020/04/coronaviruscovid-

### COVID-19 Has Caused Physical Loss of or Damage to Huntington's Property and to Other Coverage-Triggering Properties of Huntington's Neighbors, Customers, and Suppliers

38.    Based on the media and scientific reporting set forth above, there has been physical loss of, and/or damage to, Huntington's locations and other coverage-triggering locations.

39.    COVID-19 and the Pandemic have caused a distinct and demonstrable alteration of Huntington's properties and other coverage-triggering properties, including but not limited to tangible changes to such properties, as well as changes that exist in the absence of structural damage.

---

sneeze-fluid-dynamics-in-photos/) (last visited Feb. 4, 2021); Jose-Luis Jimenez, *COVID-19 Is Transmitted Through Aerosols. We Have Enough Evidence, Now It Is Time to Act*, TIME (Aug. 25, 2020) (https://time.com/5883081/covid-19-transmitted-aerosols/) (last visited Feb. 4, 2021); Wenzhao Chen*, et al.*, *Shortrange airborne route dominates exposure of respiratory infection during close contact*, BUILDING & ENV'T 176 (June 2020) (https://www.sciencedirect.com/science/article/abs/pii/S0360132320302183) (last visited Feb. 4, 2020) (Abstract); Pien Huang, *Researchers Say Fresh Air Can Prevent Aerosol Transmission Of The Coronavirus*, NPR (Sep. 7, 2020) (https://www.npr.org/2020/09/07/910499236/researchers-say-fresh-air-can-prevent-aerosol-transmission-ofthe-coronavirus) (last visited Feb. 4, 2021); Jianyun Lu & Zhicong Yang, *COVID-19 outbreak associated with air conditioning in restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 11 (Sep. 11, 2020) (https://wwwnc.cdc.gov/eid/article/26/11/20-3774_article#suggestedcitation) (last visited Nov. 18, 2020); Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 EMERGING INFECTIOUS DISEASES 7 (July 2020) (https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article) (last visited Feb. 4, 2021); Zeynep Tufeckci, *We Need to Talk About Ventilation*, THE ATLANTIC (July 30, 2020) (https://www.theatlantic.com/health/archive/2020/07/why-arent-we-talking-more-aboutairbornetransmission/ 614737/) (last visited Feb. 4, 2021); NATIONAL INSTITUTES OF HEALTH, *New coronavirus stable for hours on surfaces* (Mar. 17, 2020) (https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces) (last visited Nov. 18, 2020); Stephanie A. Boone and Charles P. Gerba, *Significance of Fomites in the Spread of Respiratory and Enteric Viral Disease*, AMERICAN SOCIETY FOR MICROBIOLOGY (Mar. 13, 2007) (https://aem.asm.org/content/73/6/1687) (last visited Feb. 4, 2021); Boris Pastorino, *et al.*, *Prolonged Infectivity of SARS-CoV-2 in Fomites*, 26 EMERGING INFECTIOUS DISEASES 9 (Sept. 2020) (https://wwwnc.cdc.gov/eid/article/26/9/20-1788_article) (last visited Feb. 4, 2021); G. Kampf, *et al.*, *Persistence of coronaviruses on inanimate surfaces and their inactivation with biocidal agents*, 104 J. OF HOSP. INFECTION 246-51 (Jan. 31, 2020) (https://www.journalofhospitalinfection.com/action/showPdf?pii=S0195-6701%2820%2930046-3) (last visited Feb. 4, 2021); Alex Chin, *et. al.*, *Stability of SARS-CoV-2 in different environmental conditions* (Apr. 2, 2020) (https://www.thelancet.com/journals/lanmic/article/PIIS2666-5247(20)30003-3/fulltext) (last visited Feb. 9, 2021); Shane Riddell, *et al.*, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 VIROLOGY J. 145 (Oct. 7, 2020) (https://doi.org/10.1186/s12985-020-01418-7) (last visited Feb. 4, 2021); Leah Moriarty, *et al.*, *Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020* (Mar. 27, 2020) (https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm) (last visited Feb. 9, 2021); Lena H. Sun and Ben Guarino, *CDC says airborne transmission plays a role in coronavirus spread in a long-awaited update after a website error last month*, THE WASHINGTON POST (Oct. 5, 2020).

40.    The global nature of the Pandemic and presence of COVID-19 on property caused and continues to cause physical loss and/or damage at Huntington's properties and/or at the properties of Huntington's customers, suppliers, and neighbors due to the nature and behavior of the virus and the associated risks, as discussed in the referenced media and scientific reporting, thereby depriving Huntington and its customers, suppliers, and neighbors of the functionality and reliability of their respective property.

41.    The global presence of COVID-19, as a Pandemic, has also caused and continues to cause physical loss of and/or damage because it has caused people to avoid accessing Huntington's property and other covered locations and/or otherwise prevents people from accessing Huntington's services.

42.    This physical loss of and/or damage to property, including Huntington's property, has required Huntington to close Huntington locations, incur extra expense, adopt remedial and precautionary measures to restore the air and surfaces at its Huntington locations, and limit or cease operations across all of its locations.

43.    Given the absence of commercially available tests for surface and aerosol presence of COVID-19 and the shortage of testing kits for humans, however, confirmed test results showing the presence of COVID-19 at a particular location are not and cannot be the only means of proving the presence of COVID-19 at a location.

44.    It is because of these above-referenced facts that Huntington has spent significant amounts of money to protect its employees, customers, and others who have been present at its locations, including for additional cleanings, the purchase of personal protective equipment ("PPE"), and investments in other protective measures.

**Governmental Orders Due to COVID-19 Caused Physical Loss of or Damage to Property**

45.    In an effort to slow the spread of COVID-19, federal, state and local governments imposed unprecedented directives through governmental orders (the "Governmental Orders") prohibiting travel to and within the United States, requiring certain businesses to close, and requiring residents to remain in their homes.

46.    The Governmental Orders have limited, restricted, or prohibited partial or total access to Huntington and neighboring locations, resulting in physical loss of and/or damage to such locations.

47.    Numerous Governmental Orders remain in effect and continue to require the suspension of business operations.

48.    As a business that relies on materials and customers from across the country and around the world, Huntington is subject to and has been adversely affected by these various Governmental Orders.

49.    The Governmental Orders have had a detrimental effect on Huntington's business.

50.    As a result of COVID-19, and the Governmental Orders, Huntington was required to partially or fully close its covered locations and/or implement protective measures that resulted in a limitation on business operations at Huntington locations and thus correspondingly resulted in physical loss of and/or damage to those locations.

51.    Even with the reopening and loosening of restrictions in certain jurisdictions, Huntington's operations have not yet returned to pre-loss levels.

52.    In some jurisdictions, new Governmental Orders restricting or closing businesses have been issued as a result of a resurgence in COVID-19 cases after reopening for only a short period of time.  Some states have begun to re-implement tighter restrictions and have required

businesses to close again after uncontrollable spread of COVID-19 and surges of COVID-19 cases and deaths.

## The Policy's Coverage is Triggered

53. The presence of the virus at, in, on or around Huntington's premises and/or the premises of its neighbors, customers, and/or suppliers, the community spread of the virus and corresponding global expanse of the Pandemic, the threat of the virus, and the above-referenced Governmental Orders have operated to prohibit access to insured properties and agent locations from which Huntington's business operates, as well as the immediate surrounding areas and other coverage-triggering properties, resulting in physical loss of or damage to such locations, and thereby triggering coverage under the Policy.

54. While there is no method to test for the presence of COVID-19 on property, many of those afflicted with the disease are asymptomatic yet able to transmit the virus.

55. Physical loss of or damage to property is thus presumed and coverage under the Policy has been triggered.

56. The presence of COVID-19 has caused a distinct and demonstrable alteration of Huntington's insured properties and/or other covered locations, including but not limited to tangible changes to the property, as well as changes that exist in the absence of structural damage, thereby causing physical loss of or damage to all such locations.

57. The Pandemic and the ubiquitous presence and spread of COVID-19, due to its highly contagious nature and ability to spread without being detected, has caused and will continue to cause physical loss of or damage to Huntington's property and other covered locations.

58.     The mere threat of the spread of such a deadly virus resulted in Huntington being unable to operate and unable to use its premises for their intended purposes causing physical loss of or damage to its property, including due to fear in the community that stopped people from coming to Huntington's locations and/or from otherwise using Huntington's services.

59.     The Governmental Orders – issued directly as a result of physical loss of or damage to property within five miles of the insured properties and agent locations – impaired access to Huntington's insured properties and other covered locations during the policy period. As a result, Huntington suffered physical loss of or damage to its property.

60.     To prevent and/or mitigate physical loss of and/or damage to its locations, Huntington has incurred substantial losses in connection with various prophylactic/preventative measures that it has implemented to prevent and/or mitigate the presence of COVID-19 at Huntington locations including, without limitation, expenses associated with the use of PPE and other administrative and engineering controls.

61.     The Policy CNA sold to Huntington covers risks of loss except for risks that are expressly and specifically excluded.  The Policy neither expressly nor otherwise excludes pandemics, communicable diseases, viruses, or COVID-19 as a covered cause of loss.

## CNA's Claims Handling

62.     On April 22, 2020, Huntington timely submitted notice to CNA under the Policy, noting that Huntington had "suffered various types of loss and/or damage, including without limitation loss of income and extra expense, due to the suspension, reduction, and/or other interruption of the Insureds operations following: recent social anxiety over health concerns,

declarations of various governmental authorities, and/or physical loss to property of the Insureds and/or others, including without limitation the Insureds suppliers and customers."[4]

63. On May 26, 2020, CNA issued a coverage position letter stating its "reservation of rights" based on certain quoted policy provisions but failed to confirm that CNA would provide coverage for Huntington's losses.[5] In its letter, CNA also conveyed its unwillingness to enter into a Non-Disclosure Agreement ("NDA") in connection with the claim despite Huntington's requests to do so.

64. On June 5, 2020, CNA sent Huntington an email requesting information related to Huntington's affected locations, closed locations, locations with positive COVID-19 employees, and the cleaning done in response to the potential exposures under the auspices that it required such insured-specific information to properly investigate whether coverage was available.[6]

65. However, at the time, CNA began to systematically deny coverage to other insureds who submitted substantially similar claims associated with COVID-19 to CNA pursuant to their insurance policies.

66. On June 16, 2020, despite CNA's refusal to enter into an NDA and despite Huntington's understanding, based on information and belief, that CNA intended to deny coverage, counsel for Huntington informed CNA via telephone conference that Huntington was gathering the requested information.

---

[4] *See* Property Loss Notice (April 22, 2020), attached hereto as Exhibit B. Although the notice reflects a date of loss commencing on April 13, 2020, the parties subsequently agreed that Huntington's loss commenced on March 13, 2020.
[5] *See* Letter from Scott Kaiser, Claims Specialist to CNA, to Barry Buchman, Counsel to Huntington (May 26, 2020), attached hereto as Exhibit C.
[6] *See* Email from S. Kaiser to B. Buchman (June 5, 2020), attached hereto as Exhibit D.

67.    On June 25, 2020, Huntington promptly provided CNA with information showing the closure status of each Huntington location since March 13, 2020. [7]  Although the June 25 email from Huntington's counsel provided the information as attachments, Huntington has not provided those attachments here and instead has attached only the email because, as Huntington made clear to CNA at the time, that operational information is strictly confidential.

68.    On July 31, 2020, Huntington sent CNA a letter enclosing additional information relating to Huntington's lost income and expenses. [8]  In its letter, however, Huntington requested that CNA provide its position on coverage of Huntington's claim before expending any further resources in providing further information.

69.    On August 6, 2020, only after Huntington provided significant information related to its losses, CNA sent Huntington a letter stating that the Policy did not provide coverage for Huntington's claim, taking the position that Huntington did not offer any evidence of "direct physical loss of or damage to" any Huntington location. [9]  CNA also represented that several exclusions may apply, including those excluding loss or damage caused by or resulting from contaminants or pollutants and from microbes.

70.    In response to CNA's denial of coverage, Huntington sent CNA a letter on November 16, 2020 explaining that the Policy provided coverage for Huntington's losses because the Policy provided coverage for physical "loss of" *or* "damage to" covered property, as many courts have recognized. [10]  Huntington also noted that the contaminants or pollutants and microbe exclusions did not apply because neither exclusion barred coverage for "viruses."

---

[7] *See* Email from B. Buchman to S. Kaiser (June 25, 2020), attached hereto as Exhibit E.
[8] *See* Letter from B. Buchman to Kathryn Parker, Claims Adjuster for CNA (July 31, 2020), attached hereto as Exhibit F.
[9] *See* Letter from K. Parker to B. Buchman (Aug. 6, 2020), attached hereto as Exhibit G.
[10] *See* Letter from B. Buchman to K. Parker (Nov. 16, 2020), attached hereto as Exhibit H.

71.    Nonetheless, CNA reaffirmed its denial of coverage in a letter to Huntington on January 7, 2021.[11]  In this same letter, CNA refused to extend the Policy's one-year contractual limitations period for Huntington to file suit.

## CONDITIONS PRECEDENT

72.    All conditions precedent to the filing of this lawsuit have been performed or have occurred.

## CLAIMS FOR RELIEF

## COUNT I
## Declaratory Judgment

73.    Huntington repeats and incorporates the allegations set forth in paragraphs 1 through 72 of this Complaint as if fully set forth herein.

74.    Huntington seeks a declaration, pursuant to 28 U.S.C. § 2201, that CNA is obligated, in accordance with the terms of the Policy, including the provisions listed in paragraphs 18 through 34, to provide insurance coverage for the losses of Huntington in relation to its insured properties up to the applicable limits of liability resulting from the COVID-19 pandemic.

75.    An actual and justiciable controversy exists between the parties with respect to this issue because of CNA's refusal to perform its obligations under the Policy.

76.    A declaration of the parties' rights and obligations under the Policy will serve to resolve the dispute between them.

---

[11] *See* Letter from Sean Pappas, National General Adjuster to CNA, to B. Buchman (Jan. 7, 2021), attached hereto as Exhibit I.

**COUNT II**
**Breach of Contract**

77.    Huntington repeats and incorporates the allegations set forth in paragraphs 1 through 72 of this Complaint as if fully set forth herein.

78.    Huntington and CNA are parties to the Policy, which is a valid and existing contract.

79.    By refusing and failing to provide coverage to Huntington with respect to the losses it sustained as a result of the COVID-19 pandemic, as set forth above, CNA has breached the Policy.

80.    Accordingly, CNA is liable to Huntington for all damages sustained as a consequence of CNA's wrongful failure to provide coverage to Huntington for its losses and breach of the terms of the Policy, including the provisions listed in paragraphs 18 through 34.

81.    As a direct and proximate result of CNA's breach of contract, Huntington has been deprived of the benefit of the Policy and has incurred damages, the amount of which shall be determined at trial, plus interest.

82.    It has been necessary for Huntington to retain counsel to enforce its rights to coverage. Accordingly, Huntington is entitled to recover its attorneys' fees and costs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Huntington respectfully prays that this Court:

1.    Enter a judgment pursuant to 28 U.S.C. § 2201 declaring that CNA is obligated, in accordance with the terms of the Policy, to provide insurance coverage for the losses of Huntington in relation to its insured properties up to the applicable limits of liability.

2.    Enter a judgment against CNA awarding Huntington its actual damages sustained as a result of CNA's breach of its obligations under the Policy, in an amount to be established through proof at the time of trial, as well as all interest permitted by contract and by law;

3.    Enter a judgment against CNA awarding Huntington pre-judgment interest and post-judgment interest;

4.    Enter a judgment against CNA awarding Huntington its costs of court;

5.    Enter a judgment against CNA awarding Huntington its attorneys' fees and expenses incurred in connection with this action; and

6.    Enter a judgment against CNA awarding Huntington such other and further relief to which it may be justly entitled.


Dated: March 10, 2021         Respectfully submitted,



By:    s/ Shawn J. Organ

        Shawn J. Organ (0042052)
        *Trial Attorney*
        **ORGAN LAW LLP**
        1330 Dublin Road
        Columbus, OH 43215
        614.481.0901 (T)
        614.481.0904 (F)
        sjorgan@organlegal.com

        *Counsel for Plaintiffs Huntington Bancshares Incorporated and The Huntington National Bank*

## **JURY DEMAND**

Huntington demands a trial by jury on all matters so triable composed of the maximum

numbers of jurors allowed by law.

s/ Shawn J. Organ
*Counsel for Plaintiffs Huntington Bancshares*
*Incorporated and The Huntington National Bank*